UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 3:12CR386- RJC |
| v. | **BILL OF INDICTMENT** |
| (1) JOHN W. FEMENIA <br> (2) SHAWN C. HEGEDUS <br> (3) DANIELLE C. LAURENTI <br> (4) MATTHEW J. MUSANTE <br> (5) AARON M. WENS <br> (6) ROGER A. WILLIAMS <br> (7) KENNETH M. RABY <br> (8) FRANK M. BURGESS, JR. <br> (9) JAMES A. HAYES | Violations: <br><br> 15 U.S.C. § 78j(b) <br> 15 U.S.C. § 78ff <br> 17 C.F.R. §§ 240.10b5, 240.10b5-2 <br> 18 U.S.C. § 371 <br> 18 U.S.C. § 1344 <br> 18 U.S.C. § 1349 <br> 18 U.S.C. § 1956(h) |

THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

1. From in or about March 2010 through in or about December 2012, the defendants and others were members of an insider trading conspiracy that stole material nonpublic information, including information about upcoming corporate mergers and acquisitions, from Wells Fargo and its clients, and used that information for insider trading. The criminal conspiracy captured over $11 million in proceeds.

## I. Certain Individuals and Entities

2. JOHN W. FEMENIA, a resident of Charlotte, North Carolina, and then New York, New York, worked as an investment banker for Wells Fargo Securities, LLC, and its parent company Wells Fargo Bank (collectively, "Wells Fargo") from at least March 2010 through December 2012. This employment provided FEMENIA with the opportunity to steal material nonpublic information ("Inside Information") concerning potential and upcoming mergers and acquisitions and other confidential material information involving Wells Fargo clients. Despite his fiduciary duty to keep all such Inside Information confidential, FEMENIA stole and sold Inside Information to co-conspirators in exchange for kickbacks paid in several forms, including cash and gold bars.

3. SHAWN C. HEGEDUS, a resident of New York, was a high-school friend of FEMENIA employed at times as a stockbroker and supposed financial advisor. Along with his girlfriend and co-conspirator, DANIELLE C. LAURENTI, HEGEDUS controlled entities in the names of Coram Real Estate Holdings, Inc. ("Coram") and Goldstar P.S. Inc. ("Goldstar"). HEGEDUS acquired Inside Information from FEMENIA, traded on it through Coram and

1

Goldstar for profits in excess of $1.6 million, and further provided the Inside Information to other conspirators, often handling the insider trades for such conspirators. HEGEDUS also facilitated kickbacks to FEMENIA for such Inside Information in several forms, including cash and gold bars.

4. DANIELLE C. LAURENTI, a resident of New York, was HEGEDUS' girlfriend. LAURENTI also controlled Coram and Goldstar, acquired Inside Information, traded on it through Coram and Goldstar for profits in excess of $1.6 million, and facilitated the receipt and handling of kickbacks for such Inside Information.

5. MATTHEW J. MUSANTE, a resident of Miami, Florida, was a friend of FEMENIA and HEGEDUS who acquired Inside Information from FEMENIA and HEGEDUS, and traded on it for profits in excess of $1.3 million with his own account and an account in the name of his father.

6. AARON M. WENS, a resident of Encinatas, California, was a college friend of FEMENIA who acquired Inside Information from FEMENIA, traded on it for profits in excess of $250,000, and paid kickbacks for such Inside Information to FEMENIA.

7. ROGER A. WILLIAMS, a resident of Georgetown, South Carolina, acquired Inside Information from HEGEDUS which was used to make trades resulting in profits in WILLIAMS' name of nearly $4 million, and further provided such Insider Information to other conspirators, paying and facilitating kickbacks for such Inside Information to and through HEGEDUS.

8. KENNETH M. RABY, a resident of Greer, South Carolina, acquired Insider Information from WILLIAMS and HEGEDUS which was used to make trades resulting in profits in RABY's name of over $3.5 million, and paid kickbacks for such Inside information to and through WILLIAMS and HEGEDUS.

9. FRANK M. BURGESS, JR., a resident of Charlotte, North Carolina, acquired Inside Information from WILLIAMS and traded on it for profits of over $250,000.

10. JAMES A. HAYES, a resident of Charlotte, North Carolina, acquired Inside Information from WILLIAMS and traded on it for profits of over $170,000.

11. K.L., a resident of New York, New York, was FEMENIA's girlfriend. Among other things, K.L. set up a bank account in her name to assist FEMENIA with the receipt of kickbacks and money laundering such kickbacks.

## II. The Insider Trading

12. FEMENIA breached his duty of trust and loyalty to Wells Fargo and its clients to keep material nonpublic information confidential.

   a. Wells Fargo provided financial and corporate advisory services to corporate clients considering or engaged in a potential merger or acquisition. In

connection with such services, Wells Fargo received material nonpublic Inside Information that was highly confidential.

   b. Wells Fargo received, and FEMENIA stole, such Inside Information about each of the mergers and acquisitions noted below.

   c. Public news of a merger or acquisition generally has a substantial impact on the price of a stock. Accordingly, stealing material nonpublic Inside Information about an upcoming or potential merger or acquisition, as the conspirators did here, allows a trader to cheat and earn substantial profits by trading before such news becomes public, earning substantial profits by trading again once the news becomes public and impacts the stock price.

   d. Wells Fargo safeguarded against the theft of Inside Information with numerous robust policies and procedures that protected client's material nonpublic information.

   e. Wells Fargo required FEMENIA repeatedly to attest and agree that he was familiar with and subject to these policies and procedures, which spelled out in detail his obligation to keep material nonpublic client information confidential. Indeed, Wells Fargo's materials even warned FEMENIA repeatedly that disclosing material non-public information could subject him to criminal prosecution and would be grounds for immediate dismissal.

  13. Nevertheless, FEMENIA stole and sold to his co-conspirators Inside Information about several potential and upcoming mergers and acquisitions (along with other confidential material nonpublic information) four of which are discussed below.

### A. Insider Trading Re: GENCO's Acquisition of ATC

  14. GENCO Distribution System, Inc. ("GENCO") was a private logistics company that acquired ATC Technology Corporation ("ATC"), another logistics-based company that was publicly traded on NASDAQ. The GENCO-ATC agreement was publicly announced on July 19, 2010. GENCO hired Wells Fargo to provide financing for the deal.

  15. By March 2010, FEMENIA had stolen Inside Information about the potential GENCO acquisition of ATC.

  16. On or about March 26, 2010, FEMENIA called HEGEDUS, providing him with such Inside Information in exchange for kickbacks.

  17. HEGEDUS and LAURENTI began acting immediately, the same day effecting trades in ATC, using a brokerage account in the name of Coram. The same day, HEGEDUS also called WILLIAMS, who immediately effected trades in ATC, and who passed the Inside Information to other conspirators who likewise effected trades in it almost immediately.

  18. Later, in May 2010, FEMENIA also provided the Inside Information to WENS, who similarly effected trades in ATC immediately.

19. On or about July 19, 2010, the GENCO-ATC acquisition became public information. The ATC stock price increased by 39% (thirty-nine percent). That day, nearly all of the conspirators started effecting trades in ATC, realizing collectively in total over $500,000 in profits.

20. The same day, WILLIAMS effected the transfer of $150,000 to a Coram brokerage account controlled by HEGEDUS and LAURENTI.

21. The next day, over $175,000 was transferred from the Coram brokerage account to a bank account controlled by HEGEDUS and LAURENTI.

22. Over the next two months, FEMENIA deposited and caused to be deposited over $30,000 in cash into his personal account.

### B. Insider Trading Re: Rock-Tenn's Acquisition of Smurfit-Stone

23. Rock-Tenn Company ("Rock-Tenn") was a packaging manufacturing company traded on the New York Stock Exchange ("NYSE") that acquired Smurfit-Stone Container Corporation ("Smurfit-Stone"), another packaging company traded on the NYSE. The Rock-Tenn-Smurfit-Stone agreement was publicly announced on January 23, 2011. Rock-Tenn hired Wells Fargo as its financial advisor for the deal.

24. By mid-January 2011, FEMENIA had stolen Inside Information about the potential Rock-Tenn acquisition of Smurfit-Stone.

25. On or about January 18, 2011, FEMENIA called HEGEDUS, providing him with such Inside Information in exchange for kickbacks.

26. HEGEDUS and LAURENTI began acting on the Inside Information right away, the next day effecting trades in Smurfit-Stone, using a Coram brokerage account. The same day, HEGEDUS also called WILLIAMS, who also immediately began effecting trades in Smurfit-Stone, and who passed the Inside Information to other conspirators, who likewise began effecting trades in it almost immediately.

27. At the same time, HEGEDUS and FEMENIA also provided the Inside Information to MUSANTE, who similarly began effecting trades in Smurfit-Stone immediately, using an account in his father's name.

28. On or about Sunday, January 23, 2011, the Rock-Tenn-Smurfit-Stone acquisition became public information. The Smurfit-Stone stock price increased by 27% (twenty-seven percent). The next day (Monday), nearly all of the conspirators started effecting trades in Smurfit-Stone, realizing collectively in total nearly $1.5 million in profits.

29. Between January 24, 2011, and February 4, 2011, nearly $600,000 was transferred from Coram's brokerage account to a bank account controlled by HEGEDUS and LAURENTI.

4

30. On or about January 26, 2011, HEGEDUS and LAURENTI laundered at least $200,000 through a Las Vegas casino.

31. On or about February 2, 2011, WILLIAMS effected the transfer of over $100,000 to a Coram brokerage account.

32. Over the next five months, FEMENIA deposited and caused to be deposited over $19,000 in cash into his personal account.

### C.  Insider Trading Re:  Kirby's Acquisition of K-Sea

33. Kirby Corporation ("Kirby") was a transportation company traded on the NYSE that acquired K-Sea Transportation Partners L.P. ("K-Sea"), another transportation company traded on the NYSE. The Kirby-K-Sea agreement was publicly announced on March 13, 2011. Kirby hired Wells Fargo as its financial advisor for the deal.

34. By October 2010, FEMENIA had stolen Inside Information about the potential Kirby acquisition of K-Sea.

35. In or about October, 2010, FEMENIA called HEGEDUS, providing him with such Inside Information in exchange for kickbacks.

36. HEGEDUS and LAURENTI began to act on the Inside Information, effecting trades in K-Sea on October 29, 2010, again using the Coram brokerage account. HEGEDUS called WILLIAMS, who also began effecting trades in K-Sea in October 2010, and who passed the Inside Information to other conspirators, who likewise began effecting trades in it in October 2010.

37. Soon thereafter, in December 2010, HEGEDUS and FEMENIA also provided the Inside Information to MUSANTE, who began effecting trades in K-Sea soon thereafter, again under his father's name.

38. On or about March 13, 2011, the Kirby-K-Sea acquisition became public information. The K-Sea stock price increased by 26% (twenty-six percent). The next day, nearly all of the conspirators started effecting trades in K-Sea, realizing collectively in total over $1.8 million in profits.

39. Between March 15, 2011, and March 24, 2011, $89,000 was transferred from Coram's brokerage account to a bank account controlled by HEGEDUS and LAURENTI.

40. On or about March 28, 2011, WILLIAMS effected the transfer of nearly $115,000 to a bank account controlled by HEGEDUS and LAURENTI.

41. On or about April 13, 2011, RABY sent over $117,000 to HEGEDUS's mother.

42. On or about April 27, 2011, a check for the same amount was deposited from HEGEDUS's parents into a bank account controlled by HEGEDUS and LAURENTI.

### D. Insider Trading Re: CBI's Acquisition of Shaw

43. Chicago Bridge & Iron Company, N.V. ("CBI") was an engineering and construction company in the energy industry, traded on the NYSE, that acquired The Shaw Group ("Shaw"), another company providing support services for companies in the energy and other industries, also traded on the NYSE. The CBI-Shaw agreement was publicly announced on July 30, 2012. CBI approached Wells Fargo about potentially financing the deal.

44. By July 2012, FEMENIA had stolen Inside Information about the potential CBI acquisition of Shaw.

45. On or about July 5, 2012, FEMENIA called HEGEDUS, providing him with such Inside Information in exchange for kickbacks.

46. The next day, HEGEDUS and LAURENTI began acting on the Inside Information, effecting trades in Shaw, first using a brokerage account in the name of Goldstar and then using the Coram brokerage account. The same day, HEGEDUS called WILLIAMS, who also began effecting trades in Shaw that day, and who passed the Inside Information to other conspirators, who likewise began effecting trades in it immediately.

47. On or about July 5, 2012, FEMENIA also called MUSANTE and WENS, providing them with the Inside Information. Within days, both conspirators acted on the Inside Information, beginning to trade in Shaw, with MUSANTE effecting trades in his father's name, and also in his own.

48. On or about July 30, 2012, the CBI-Shaw acquisition became public information. Shaw's stock price increased by 64% (sixty-four percent). That day, nearly all of the conspirators started effecting trades in Shaw, realizing collectively in total nearly $7.5 million in profits.

49. On or about August 1, 2012, over $318,000 was transferred from Coram's brokerage account to a bank account controlled by HEGEDUS and LAURENTI.

50. On or about August 1-2, 2012, HEGEDUS and LAURENTI wired nearly $1 million from Goldstar and Coram accounts to a precious metals dealer in Manhattan to buy over 550 gold bars, which HEGEDUS and LAURENTI picked up in person on or about August 2, 2012.

51. On or about August 2, 2012, HEGEDUS and LAURENTI laundered at least $100,000 through a Las Vegas casino.

52. On or about August 4, 2012, K.L. appeared in person at a Bank of America branch in East Islip, New York, and opened a personal account in her name to be used to launder kickbacks for FEMENIA. Over the next month, FEMENIA caused the deposit of over $32,000 into the K.L. account, nearly $20,000 of which was deposited in cash through ATM machines, including by WENS, WENS's mother, and FEMENIA.

53. On or about August 13, 2012, over $180,000 was transferred from Coram's brokerage account to a bank account controlled by HEGEDUS and LAURENTI.

54. On or about August 16, 2012, LAURENTI withdrew $150,000 in cash from the bank account she controlled with HEGEDUS.

55. On or about August 24, 2012, WILLIAMS effected the deposit of $253,000 into the bank account controlled by HEGEDUS and LAURENTI.

56. On or about August 24, 2012, RABY effected the deposit of $258,000 into another bank account controlled by HEGEDUS and LAURENTI.

57. On or about August 28, 2012, LAURENTI withdrew $200,000 in cash from a bank account she controlled with HEGEDUS.

58. On or about August 31, 2012, LAURENTI withdrew another $200,000 in cash from a bank account she controlled with HEGEDUS.

59. On or about September 21, 2012, FEMENIA and K.L. shipped 4 gold bars to a precious metals dealer in Oklahoma.

60. On October 1 and October 15, 2012, that precious metals dealer in Oklahoma paid FEMENIA a total $70,877 for such gold, which FEMENIA deposited into his personal bank account.

### III. The Mortgage Fraud

61. On or about February 1, 2008, FEMENIA and HEGEDUS carried out a mortgage fraud with the fraudulent purchase 617 Beauhaven Lane, Waxhaw, North Carolina, for $1,119,000, fraudulently obtaining almost $900,000 in mortgage loans. The property was a luxury home in the Chatelaine neighborhood in Union County. The pair schemed to fraudulently purchase it in FEMENIA's name, using FEMENIA's credit, for HEGEDUS's primary use.

62. To fraudulently obtain the mortgage loans for 617 Beauhaven Lane, FEMENIA's loan application falsely claimed, among other things, that:

    a. FEMENIA earned $18,750 per month ($225,000 annually) as a Vice-President for Goldstar Debt Relief Services, when, in truth and Fact, FEMENIA was a business school student at the time who did not have such earnings from Goldstar employment.

    b. GoldStar Debt Relief Services was "in the process of relocating to North Carolina," where FEMENIA would continue his lucrative employment, and FEMENIA was handling the transition, as reflected in a letter signed by HEGEDUS, when, in truth and fact, this was a lie and the supposed Goldstar employment was a sham.

    c. FEMENIA would live in the home as his primary residence, when, in truth and fact, he had no such intention and HEGEDUS, at best, would use in the home.

7

    d.  FEMENIA had $300,000 cash in a checking account with Citibank, when, in truth and fact, he had no such cash in such an account.

  63.  FEMENIA did not even show up for the closing. Rather, at the closing on February 1, 2008, HEGEDUS signed the fraudulent loan application and related documents to fraudulently obtain the loans as FEMENIA's attorney-in-fact.

# COUNT ONE
## 18 U.S.C. § 371
### (Insider Trading Conspiracy)

64. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 63 of the Bill of Indictment, and further alleges that:

65. From in or about March 2010 through in or December 2012, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

(1) JOHN W. FEMENIA
(2) SHAWN C. HEGEDUS
(3) DANIELLE C. LAURENTI
(4) MATTHEW J. MUSANTE
(5) AARON M. WENS
(6) ROGER A. WILLIAMS
(7) KENNETH M. RABY
(8) FRANK M. BURGESS, JR.
(9) JAMES A. HAYES

did knowingly combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit offenses against the United States, including violations of Title 15, United States Code, Section 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2 (insider trading).

### Object of the Conspiracy

66. *Insider Trading.* It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, willfully, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the sale of securities by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, including engaging in trades involving securities of issuers on the basis of material nonpublic information about those securities and issuers, in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively, to the issuers of those securities, the shareholders of those issuers, and to other persons and entities who were the source of the material nonpublic information, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Manner and Means

67. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 60 of this Bill of Indictment, among others.

## Overt Acts

68. In furtherance of the conspiracy, and to accomplish the objects thereof, one or more defendant committed one or more of the overt acts set forth in paragraphs 12 through 60 of this Bill of Indictment, in the Western District of North Carolina and elsewhere.

All in violation of 18 U.S.C. § 371.

# COUNT TWO
## 18 U.S.C. § 1349
### (Wire Fraud Conspiracy)

69. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 68 of the Bill of Indictment, and further alleges that:

70. From in or about March 2010 through in or about December 2012, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

> (1) JOHN W. FEMENIA
> (2) SHAWN C. HEGEDUS
> (3) DANIELLE C. LAURENTI

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, including violations of Title 18, United States Code, Section 1343 (wire fraud).

### Object of the Conspiracy

71. *Wire Fraud.* It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, having devised the above-described schemes and artifices to defraud and for misappropriating Inside Information and money by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Manner and Means

72. The conspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 60 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE
## 15 U.S.C. §§ 78j(b), 78ff
## (Insider Trading)

73. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72 of the Bill of Indictment, and further alleges that:

74. From in or about March 2010 through in or about December 2012, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) JOHN W. FEMENIA
### (2) SHAWN C. HEGEDUS
### (3) DANIELLE C. LAURENTI

aided and abetted by each other and others known and unknown to the Grand jury, willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon persons, namely, stealing and trading upon the Inside Information set forth above by engaging in trades involving securities of issuers on the basis of material nonpublic information about those securities and issuers, in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively, to the issuers of those securities, the shareholders of those issuers, to Wells Fargo, and to other persons and entities who were the source of the material nonpublic information.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

# COUNT FOUR
## 18 U.S.C. § 1344
## (Mortgage Fraud)

75. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 74 of the Bill of Indictment, and further alleges that:

76. On or about February 1, 2008, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

### (1) JOHN W. FEMENIA
### (2) SHAWN C. HEGEDUS

and others known and unknown to the Grand Jury, aiding and abetting one another, with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did knowingly execute and attempt to execute the above described scheme and artifice to defraud and to obtain by means of false and fraudulent pretenses, representations and promises, money, funds, and credit under the custody and control of a federally insured financial institution, namely, the mortgage loans obtained from Countrywide Bank, FSB in connection with the sale of 617 Beauhaven Lane, Waxhaw, North Carolina.

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT FIVE
## 18 U.S.C. § 1956(h)
## (Money Laundering Conspiracy)

77. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 76 of the Bill of Indictment, and further alleges that:

78. The defendants and others agreed, among other things, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of insider trading by conducting financial transactions with such criminal proceeds (i) in cash; (ii) using bank and brokerage accounts in the names of corporations; (iii) using bank and brokerage accounts in the names of other people; (iv) purchasing gold bars from a precious metals dealer, moving them to a hidden location, and then reselling some such gold bars for cash through another precious metals dealer; and (v) through a Las Vegas casino.

79. From in or about March 2010 through in or about December 2012, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) JOHN W. FEMENIA**
**(2) SHAWN C. HEGEDUS**
**(3) DANIELLE C. LAURENTI**

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) (concealment money laundering), and to knowingly conduct financial transactions affecting interstate and foreign commerce, which involved more than $10,000 in proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1957 (greater than $10,000 money laundering).

All in violation of Title 18, United States Code, Section 1956(h).

14

Case 3:12-cr-00386-RJC   Document 3   Filed 12/12/12   Page 14 of 16

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

80. The Grand Jury realleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 79 of the Bill of Indictment, and further alleges that:

81. Notice is hereby given, pursuant to Federal Rule of Criminal Procedure 32.2(a), of the provisions of 18 U.S.C. § 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981, and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by 18 U.S.C. § 981(a)(1)(c). The defendant has or had possessory or legal interests in the following property that is subject to forfeiture in accordance with Section 982 and/or Section 2461(c):

    a. All property involved in the violations alleged in this Bill of Indictment, or traceable to such property;

    b. All property which is proceeds of such violations, or traceable to such property; and,

82. In the event that any property described in (a) or (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants, to the extent of the value of the property described in (a) and (b).

83. The Grand Jury finds probable cause to believe that following property is subject to forfeiture on one or more of the grounds stated above:

    a. all currency and monetary instruments constituting or derived from proceeds traceable to the scheme alleged in this Bill of Indictment, including but not limited to the sum of approximately $11,000,000 in proceeds;

    b. 550 gold bars purchased from Bullion Trading LLC on or about August 2, 2012;

    c. The real property located at 617 Beauhaven Lane, Waxhaw, North Carolina, 28173.

A TRUE BILL



ANNE M. TOMPKINS

UNITED STATES ATTORNEY

*Kurt W. Meyers*
KURT W. MEYERS
ASSISTANT UNITED STATES ATTORNEY